# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **MARCELLA CURRY** | * | **CIVIL ACTION NO. 04-2331** |
| **VERSUS** | * | **JUDGE MELANÇON** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Marcella Curry, born June 13, 1961, filed an application for benefits on August 8, 1988, alleging disability due to sarcoidosis, cardiomyopathy, and shortness of breath. Based on that application, claimant was found disabled. Her file was reviewed in 1998, but the medical evidence from when she had been granted benefits had been lost. Accordingly, the Comparison Point Decision ("CPD") occurred on January 11, 1999.

Claimant's file came up for review again. On September 12, 2002, claimant was notified that she was no longer under a disability, and that her benefits would cease effective November 30, 2002. (Tr. 45). Claimant asked for reconsideration before a Disability Hearing Officer, but failed to attend the hearing. (Tr. 65). The

Disability Hearing Officer affirmed the cessation of benefits, finding that she had no severe impairment. (Tr. 64-69).

Subsequently, claimant asked for a hearing and review of the cessation of benefits before an Administrative Law Judge ("ALJ"). After a hearing, in which claimant was not represented, the ALJ issued a decision on July 20, 2004, finding that, as of September 1, 2002, claimant's disability had ceased. (Tr. 12-19). The Appeals Council denied review on September 10, 2004. (Tr. 4-6). Thereafter, claimant sought judicial review with this Court.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:[1]

---

[1] Although all of the records were reviewed by the undersigned, only those subsequent to the CPD are addressed herein.

**(1) Records from J. Darwin Hales, D.O., dated January 30, 2000 to December, 2001**. On December 3, 2001, claimant complained of an asthma attack after exposed to a Christmas tree. (Tr. 289). She was given Prednisone and Albuterol in the emergency room. Dr. Hales increased her Prednisone and refilled her nebulizer. Chest x-rays showed a mildly prominent heart. (Tr. 288).

On December 18, 2001, claimant complained of wheezing, shortness of breath, coughing, chest tightness, back pain, and inability to sleep well. (Tr. 289). She was five feet, five inches tall and weighed 200 pounds. Pulmonary function studies revealed an FEV1 of 2.18 pre-bronchodilator and 1.91 post-bronchodilator. (Tr. 281).

**(2) Records from Dr. James Russell Romero dated March 5, 2001 to January 3, 2002**. On March 5, 2001, claimant complained of sinus headache and drip, left ear and nasal congestion, and coughing. (Tr. 300). She also wanted a refill on Xanax. The assessment was pharyngitis and otitis media.

On May 4, 2001, claimant complained of sinus problems, neck pain, and anxiety. (Tr. 299). On examination, she had very red infected nasal mucosa and tenderness over the cervical spine on extension. The assessment was sinusitis. She was prescribed Xanax, Augmentin, Allegra, Nasacort, and Celebrex.

On August 27, 2001, claimant complained of headache, sinus infection, and anxiety. (Tr. 297). Her lungs were clear on examination. The assessment was acute

3

hypertensive chronic anxiety.

On October 19, 2001, claimant was seen for a painful left foot. (Tr. 296). An x-ray showed a fractured left talus. (Tr. 294-96). On November 30, 2001, she was prescribed Lorcet for left foot pain. (Tr. 291).

Claimant was seen on January 2, 2002, after she slipped on ice on the steps. (Tr. 290). She complained of low back pain, a sinus head cold with fever, and anxiety. The assessment was tonsilitis, anxiety, sinusitis, and back pain.

A lumbosacral spine series on January 3, 2002, revealed mild lumbar bowing and mild vertebral body osteophytosis. (Tr. 301).

**(3) Consultative Examination by Dr. Kenneth A. Ritter dated August 7, 2002**. Claimant complained of a history of sarcoidosis, recurrent asthma, insomnia, frequent blurry vision, occasional headaches, occasional chest tightness, occasional nausea and heartburn, occasional nocturia, and intermittent left knee problems. (Tr. 303). Her medications included Albuterol nebulizer treatments for wheezing and Advair Diskus inhaler twice daily.

On examination, claimant was 5 feet 5 inches tall and weighed 195 pounds. (Tr. 304). Her lungs were clear. She had sinus rhythm without a murmur or gallop. Her abdomen was obese.

On extremities examination, claimant had no ankle swelling; full range of motion without any redness, heat, tenderness or swelling of any joint; negative straight-leg raises; normal gait and station, and normal dorsalis pedis pulses. Neurologically, she was intact with normal DTRs, strength and sensation.

Chest x-rays revealed a normal heart size. Claimant did have prominent hilar areas, especially on the right, with scattered flecks of calcium, probably secondary to old granulomatosis disease. (Tr. 305). Lung field were otherwise clear.

Pulmonary function studies revealed a mild restrictive ventilatory defect with no improvement after bronchodilator. Her FVC was 2.36 and FEV1 was 2.06 pre-bronchodilator. (Tr. 310). Her cooperation was fair. (Tr. 309).

Dr. Ritter's impression was a history of asthma, currently under very good control, and a history of sarcoidosis over 10 years ago, which appeared to be in remission.

In the Medical Assessment of Ability to do Work-Related Activities (Physical), Dr. Ritter found that claimant was limited to lifting/carrying 25-35 pounds occasionally and 10-25 pounds frequently. (Tr. 306). Her ability to stand/walk and sit were not affected by her impairment. She was able to climb, stoop, kneel, balance, crouch, and crawl frequently. She had environmental restrictions as to dust and fumes.

**(4) Residual Functional Capacity Assessment dated August 30, 2002**. The examiner determined that claimant could lift/carry 20 pounds occasionally and 10 pounds frequently. (Tr. 312). She could stand/walk and sit about 6 hours in an 8-hour workday. She had unlimited push/pull ability. She could occasionally climb ramps and stairs, crouch and crawl; could frequently balance, stoop, and kneel, and never climb ladders, ropes, and scaffolds. (Tr. 313). She was to avoid concentrated exposure to extreme cold and heat, humidity, and fumes, odors, dusts, gases, and poor ventilation. (Tr. 315). The assessment was affirmed as written on September 20, 2002. (Tr. 318).

**(5) Report from Iberia Medical Center dated March 15-16, 2003**. Claimant was admitted for vomiting, dehydration, and low blood pressure. (Tr. 322). She was prescribed Phenergan and Morphine, and was instructed to rest.

**(6) Records from Darvin Hales, D.O., dated September 7, 2002 to May 28, 2003**. On September 17, 2002, claimant complained of chest tightness, shortness of breath, and wheezing. (Tr. 333). Chest x-rays showed no evidence of acute cardiopulmonary disease. (Tr. 334). Spirometry showed her FEV1 at 1.82 pre-bronchodilator and 2.14 post-bronchodilator. (Tr. 335). Her FVC was 2.11 pre-brochodilator, and 2.32 post-bronchodilator.

On February 25, 2003, claimant complained of shortness of breath, left-sided chest pain, and coughing. (Tr. 330). X-rays showed normal heart size and clear lung fields. (Tr. 331). Spirometry showed FVC at 1.86 pre-bronchodilator and 2.1 post-bronchodilator, and FEV1 at 1.54 pre-bronchodilator and 1.8 post-bronchodilator. (Tr. 328).

**(7) Claimant's Administrative Hearing Testimony**. At the hearing on June 9, 2004, claimant was 42 years old. (Tr. 26). She had attended school until the eighth grade. The ALJ questioned her as to whether she wanted to proceed without a representative, to which she responded that she did. (Tr. 27).

Claimant testified that she had been to the emergency room a couple of times for shortness of breath and migraines. (Tr. 28). She reported that she was given a treatment for shortness of breath, for which she used a nebulizer at home. She also stated that she had been treated by Dr. Romero for nerve problems and a broken foot in 2002. (Tr. 29).

As to other problems, claimant reported that she had a sleeping disorder, for which Dr. Hales had performed a sleeping test in 1997. (Tr. 29-30). She explained that she sometimes woke up at 2:00 or 3:00 in the morning because she could not breathe. (Tr. 29).

Claimant testified that she had worked at the Council on Aging while she was in school. (Tr. 31).[2] She reported that she did not drive. (Tr. 31, 39). She also said that she did not read a newspaper or write notes. (Tr. 31-32). She stated that she did not go to the store or do housework. (Tr. 32, 39).

**(8) Administrative Hearing Testimony of Claimant's Sister, Otharee Loston**. Ms. Loston testified that all that claimant did was sit in the yard to get fresh air. (Tr. 33). She stated that claimant could not walk too far because she became out of breath. She reported that claimant went to Ms. Loston's trailer next door and to the doctor, but really did not go anywhere else.

**(9) Administrative Hearing Testimony of Dr. George Smith**. Dr. Smith noted that claimant had been diagnosed with sarcoidosis in 1988, but he did not have any records from then. (Tr. 36). He stated that the earliest reports he had were from 1992, including numerous pulmonary function tests showing no deterioration and suggesting some improvement. Dr. Smith opined that he did not find anything on these tests showing that she would meet or equal the listing for chronic restrictive lung disease. He reported that everyone's interpretation had been of mild to moderate restrictive disease.

---

[2]Claimant informed Dr. Ritter that she had last worked about 10 years prior doing private duty sitting. (Tr. 304).

8

When the ALJ asked Dr. Smith whether claimant would have any limitations besides avoidance of polluted atmospheres in the work place, Dr. Smith responded that she would not based on the record. (Tr. 38). He also confirmed that she should be able to accomplish most work activity if she had her medications for mild to moderate breathing difficulties available.

**(10) Administrative Hearing Testimony of Wendy Klamm, Vocational Expert ("VE")**. The ALJ posed a hypothetical in which he asked Ms. Klamm to assume a claimant who was 42 years old with a limited education and no work background, who was limited to sedentary or light unskilled work that would not involve extreme polluted atmosphere conditions. (Tr. 40). In response, Ms. Klamm identified the positions of cafeteria attendant, of which there were 2,100 jobs available statewide and 117,525 nationally; small products assembler, of which there were 4,300 jobs available statewide and 356,000 nationally, and fast food worker, of which there were 5,725 jobs statewide and 366,000 nationally. (Tr. 40-41). When the ALJ asked whether the limitation to avoiding polluted atmosphere conditions would affect the identified jobs, Ms. Klamm stated that the majority would remain intact. (Tr. 41).

**(11) The ALJ's Findings are Entitled to Deference**. Claimant argues that: (1) the ALJ erred by positing a defective hypothetical question to the vocational

expert; (2) the ALJ required the vocational expert to assume that claimant must void extremes in airborne irritants, which assumption is not supported by substantial evidence, and (3) in the event of remand, plaintiff is entitled to interim benefits until the Commissioner properly reviews her claim.

At the outset, claimant argues that the Commissioner erred in finding medical improvement where the evidence supporting the original award was missing. (rec. doc. 11, pp. 2, 4; rec. doc. 15, pp. 2-3). However the Commissioner has promulgated regulations to deal with "lost file" cases:

> *Prior file cannot be located*. If the prior file cannot be located, we will first determine whether you are able to now engage in substantial gainful activity based on all your current impairments. (In this way, we will be able to determine that your disability continues at the earliest point without addressing the often lengthy process of reconstructing prior evidence.) If you cannot engage in substantial gainful activity currently, your benefits will continue unless one of the second group of exceptions applies (see paragraph (e) of this section). If you are able to engage in substantial gainful activity, we will determine whether an attempt should be made to reconstruct those portions of the missing file that were relevant to our most recent favorable medical decision (e.g., work history, medical evidence from treating sources and the results of consultative examinations). This determination will consider the potential availability of old records in light of their age, whether the source of the evidence is still in operation; and whether reconstruction efforts will yield a complete record of the basis for the most recent favorable medical decision. If relevant parts of the prior record are not reconstructed either because it is determined not to attempt reconstruction or because such efforts fail, medical improvement cannot be found. *The documentation of your current impairments will provide a basis for any future reviews*. If the missing file is later found, it may

serve as a basis for reopening any decision under this section in accordance with the rules in § 404.988.

(emphasis added).[3] 20 C.F.R. § 404.1594(c)(3)(v).

The record reflects that the Commissioner properly followed the procedures for dealing with claimant's medical improvement in light of the missing evidence. Because the CPD medical evidence was not obtainable to apply the medical improvement review standard, claimant's disability was continued for 12 months. (Tr. 46). At that point, the evidence was compared with the records available at the time of the most recent favorable decision, which was January 11, 1999. Based on the medical evidence at that time, August, 2002, the state agency found medical improvement, and ceased disability as of September, 2002.

Because the Social Security Administration established a new CPD, the records from the time that the claimant was originally granted benefits would not affect the outcome of this case. As the Commissioner points out, "[t]o hold otherwise would mean that a claimant whose claim file is lost and is not able to be reassembled would never be able to be taken off of disability payments, even where he or she has medically improved and is no longer disabled." (rec. doc. 12, p. 4). Recognizing this, the SSA promulgated regulations to address situations in which medical

---

[3]Claimant refers to a similar provision at 20 C.F.R. § 1579(c)(3) for widows, widowers, and surviving divorced spouses. (rec. doc. 15, pp. 2-3).

evidence is missing from the file. The undersigned finds that these procedures were followed in this case. Thus, this argument lacks merit.

Regarding the ALJ's finding of medical improvement, he observed that, at the time of the CPD, claimant had a history of sarcoidosis, cardiomyopathy, and shortness of breath. (Tr. 12, 46). As the ALJ noted, the current chest x-rays showed normal heart size and clear lung fields. (Tr. 15, 331). Additionally, the spirometry studies consistently showed FEV1 levels above those required by the listing at § 3.02 of FEV1 equal to or less than 1.25 L for a person who is 65 inches tall like claimant. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.02. (Tr. 15, 281, 284-85, 309-10, 328, 335). Further, Dr. Ritter determined that claimant's asthma was under very good control and that her sarcoidosis appeared to be in remission. (Tr. 305). Moreover, Dr. Smith testified at the hearing that claimant did not meet the listing the listing for chronic restrictive lung disease. (Tr. 36). Thus, the ALJ's finding as to medical improvement is supported by the evidence and is entitled to deference.

Claimant's next two arguments relate to the ALJ's hypothetical question to the vocational expert. First, claimant asserts that the hypothetical was defective because because it failed to contain any of the disabilities and limitations found by the ALJ. (rec. doc. 11, pp. 6-7; rec. doc. 15, pp. 3-4). Second, claimant argues that the hypothetical requires the VE to assume that claimant must avoid "extremes" rather

than "concentrated" exposure to airborne pollutants.

The ALJ posed the following hypothetical to the vocational expert, Wendy Klamm:

> "Describe if you would an unskilled work base that would be sedentary or light that would not involve polluted atmosphere conditions. Now, any atmosphere has some pollutants in it. Simply a matter of avoiding the extremes. I'm not concerned to limiting her to something where she would be working with a mask or anything of that nature on one hand. On the other hand, we're not wanting to put her into something as polluted as a feed mill or something like that."

(Tr. 40). In response, Ms. Klamm identified the positions of cafeteria attendant, small products assembler, and fast food worker.

The record reflects that the ALJ included the limitations relating to her disabilities in his hypothetical questions. In the decision, the ALJ found that claimant was obese and had chronic obstructive pulmonary disease, both of which were considered severe impairments. (Tr. 16). He further determined that these conditions prevented her from performing "more than light work which is not exposed to airway irritants." (Tr. 16). In formulating the hypothetical question to the VE, the ALJ included limitations to work that was "sedentary or light that would not involve polluted atmosphere conditions." (Tr. 40). As the ALJ's hypothetical to the vocational expert reasonably incorporated all disabilities of the claimant recognized by the ALJ, the ALJ's findings are entitled to deference. *Boyd v. Apfel*, 239 F.3d 698,

707 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

Regarding claimant's argument that the ALJ required the VE to assume that the plaintiff must avoid "extremes" in airborne irritants, a review of the hypothetical reflects that is not the case. The ALJ included a limitation as to sedentary or light work that "would not involve polluted atmosphere conditions." (Tr. 40). He expressly stated that he was not limiting her "to something where she would be working with a mask or anything of that nature on one hand," but clarified that he did not want "to put her into something as polluted as a feed mill or something like that." This does not indicate that the ALJ was limiting claimant to "extremes," as argued by claimant.

Additionally, the record reflects that the ALJ's limitation regarding airborne pollutants is supported by the medical evidence. Dr. Ritter determined that claimant should avoid exposure to dust and fumes. (Tr. 307). The state agency medical consultant found that she should avoid concentrated exposure to extreme cold and heat, humidity, fumes, odors, dusts, gases, poor ventilation, etc. (Tr. 315). Dr. Smith also confirmed that claimant would have no limitations besides avoidance of polluted atmospheres in the work place. (Tr. 38). Even with the limitation regarding airborne pollutants, the VE identified several positions which were available in substantial numbers to a person similarly situated to claimant. (Tr. 40-41). Thus, the ALJ's

14

finding as to claimant's residual functional capacity is entitled to deference.[4]

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing. **FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.** *DOUGLASS V. UNITED*

---

[4] As the undersigned is recommending that this case be affirmed, it is not necessary to address claimant's argument regarding interim benefits.

*SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).

Signed this 2nd day of May, 2006, at Lafayette, Louisiana.

_____
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE